IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 2, 2016

**IN RE: SAVANNAH F., ET AL.**

**Appeal from the Juvenile Court for Knox County**
**No. 150351    Timothy E. Irwin, Judge**
_____

**No. E2015-02529-COA-R3-PT**
**No. E2016-00064-COA-R3-PT**
**FILED-AUGUST 31, 2016**
_____

The trial court terminated the parental rights of Mother and Father to their three children on the grounds of persistence of conditions and severe abuse. Because there was no judicial finding of dependency, neglect, or abuse removing the children from the custody of Mother and Father more than six months prior to the termination hearing, as required by Tennessee Code Annotated Section 36-1-113(g)(3), we reverse the trial court's determination that the ground of persistence of conditions was shown by clear and convincing evidence. Because we affirm the trial court's determination of severe abuse and its determination that termination is in the children's best interests, however, we affirm the termination of Mother's and Father's parental rights to their three children.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed in Part and Affirmed in Part**

J. STEVEN STAFFORD, P.J.,W.S., delivered the opinion of the court, in which CHARLES D. SUSANO and RICHARD H. DINKINS, JJ., joined.

Sheri L. Ridgeway, Knoxville, Tennessee, for the appellant, Julia F.

Christine L. Dummer, Knoxville, Tennessee, for the appellant, Cody F.

Herbert H. Slatery, III, Attorney General and Reporter; and Alexander S. Rieger, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

**OPINION**

## Background

On June 19, 2105, the Tennessee Department of Children's Services ("DCS") filed a petition in Knox County Juvenile Court ("the trial court") to terminate the parental rights of Julia F. ("Mother") and Cody F. ("Father") to their three minor children: Savannah F., born in May 2011; Josiah F., born in April 2012, and Trinity F., born in August 2014.[1] The petition alleged that the children were removed from Mother's and Father's custody by order of the juvenile court on October 5, 2014, after Josiah presented to the emergency room with serious skull fractures. After an investigation by law enforcement and a child abuse expert, DCS concluded that the child's injuries were not consistent with Mother's and Father's explanations and therefore were the result of non-accidental trauma. The petition alleged that both parents' parental rights should be terminated on grounds of severe abuse and persistent conditions and that termination was in the children's best interests.

The trial court created separate cases for Mother and Father and filed DCS's petition under separate docket numbers. The trial court appointed attorneys to both parents and a guardian ad litem for the children. Eventually, a consolidated trial took place on the petitions against both Mother and Father on December 8, 9, and 10, 2015.[2] At trial, Dr. Marymer Perales, a child abuse pediatrician, testified about the injuries that Josiah sustained. According to Dr. Perales, she was called to consult on October 5, 2014, when Josiah arrived at the hospital with severe head injuries. In order to facilitate her investigation, Dr. Perales examined Josiah, spoke with Mother, and examined all test results that had been performed on Josiah.

Dr. Perales testified that Mother informed her that Josiah was generally healthy with no "real medical issues." According to Mother, she placed Josiah and Savannah in a room for a nap. Josiah was sleeping on a mattress on the floor. Mother, Father, and the others in the home eventually heard a loud crash and Mother went to investigate. Mother claimed that a chest of drawers had fallen on top of Josiah and that he was "bleeding and shaking." Mother then had her sibling call an ambulance. While they waited for the ambulance, Josiah continued bleeding and began vomiting. Dr. Perales did not interview Father.

---

[1] In cases involving termination of parental rights, it is the policy of this Court to remove the names of minor children and other parties in order to protect their identities.

[2] Although not reflected in the technical record, it appears from the trial transcript that the children's maternal grandmother filed a petition to intervene and to be awarded custody of the children. The trial court considered the petition in the middle of trial, but, after hearing evidence that maternal grandmother's home had not been approved as a placement under the Interstate Compact on the Placement of Children in her home state of Indiana, the trial court dismissed the petition without prejudice. The dismissal of maternal grandmother's petition is not at issue in this appeal.

A physical examination of the child revealed severe bruising around his eye and face and dried blood around his nose and ears. After a CT scan was performed on the child, Dr. Perales diagnosed him with multiple fractures on both sides of his skull. Fortunately, the tests did not show any internal bleeding or obvious brain injuries. A CT scan of his abdomen and chest also showed a "pulmonary contusion to this right upper lobe."

Because the child's injuries did not appear consistent with Mother's explanation, Dr. Perales asked that Mother and Father perform a recorded reenactment of the incident for her to review. Dr. Perales noted several inconsistencies in the reenactment, including that Mother could not remember where she found Josiah, that the child's blood appeared to be under the mattress upon which he was purportedly lying,[3] and that the chest of drawers did not appear to have been placed in a manner where it could have caused the child's injuries. During the reenactment, Father was required to help Mother move the chest of drawers in and out of place. Father also stated during the reenactment that he had come into the room to see the child's injuries and had held the child at some point prior to the ambulance's arrival. Based upon the totality of the evidence, Dr. Perales opined that the child's injuries did not result from the falling of the chest of drawers onto his chest but instead were the result of non-accidental trauma.

Cheryl Nix, an investigator with DCS, testified that DCS received a referral on October 5, 2014, to investigate the child's injuries. According to Ms. Nix, she was initially informed that the child was unlikely to survive his injuries. Ms. Nix testified that Mother informed her that the child's injuries were the result of a chest of drawers falling onto the child while he was put down to nap. According to Mother's account to Ms. Nix at the hospital, only Mother saw the child in the room immediately after his injuries, only Mother removed the chest of drawers from the child, and only Mother held the child after his injuries while awaiting the arrival of the ambulance. According to Ms. Nix, Mother had no trouble recalling the sequence of events. Ms. Nix further testified that Father initially refused to speak with her or law enforcement at the hospital. Father later informed Ms. Nix and law enforcement that he did not help Mother remove the chest of drawers from the child because Mother "had it cleaned up before he got in there."

Ms. Nix was also present during the reenactment recording for Dr. Perales. According to Ms. Nix, there were inconsistencies between Mother's and Father's statements in the hospital and at the later reenactment. For example, while Mother initially informed Ms. Nix that she alone removed the chest of drawers from the child and picked him up while awaiting the ambulance, at the reenactment, Mother and Father claimed that both parents removed the chest of drawers from the child and held the child. Ms. Nix also questioned the amount of

_____
[3] Dr. Perales testified that the blood under the mattress was not the result of blood soaking through the mattress.

blood and other bodily fluids that were found on Mother's and Father's clothes in comparison to the child's profuse bleeding and vomiting.

Ms. Nix, along with DCS Family Service Worker Lori Young, also testified regarding DCS's long and storied history with Mother and Father. DCS records admitted into evidence showed that police were called twice to the parties' home in Oregon for domestic violence issues. In January 2013, Father was charged with harassment, endangering the welfare of a minor, and possession of marijuana. The record is unclear as to the resolution of those charges. As a result of these incidents of domestic violence, Mother moved with her children to Tennessee in January 2013.

On January 29, 2013, Mother requested an order of protection against Father in Knox County. In her petition for the order of protection, Mother made the following allegations against Father:

> In October 2012, I just got home from the bank and I was there for maybe 10 minutes when I confronted [Father] about using meth. I said, "You have been gone for a long time. Where have you been[?]" I told him to leave my house and not come back [until] he was clean. [Father] went into my bedroom where my daughter was and she had gotten into our movies[.] [Father] grabbed my daughter and smacked her in the face and threw her into her room. I grabbed the phone to call the cops and he grabbed me and threw me on the floor and took my truck and phone with him.
> In June 2012, I had been up pretty much all night with our two kids because they were sick. I asked [Father] to watch the kids while I took a nap[.] [Father] said he would. I went to lay down a little while[.] Later I woke up to a big crash and my babies crying. I went out to our living room where [Father] had smashed our TV and dishes and was then yelling at our kids[.] [Father] started calling me lazy and said I never did anything and that he hated me[.] So again I told him to leave[.] He did not[.]
> In January 2011, I was pregnant and very sick again[.] [Father] was using meth[.] I woke up and was about to get ready for work when he came to the door and grabbed my purse to get my wallet. I didn't have much money and [Father] got mad and called me a piece of crap because I didn't have much. [Father] then grabbed me and told me he was going to kill me. When he went into the bedroom I ran to the nearest store to call my mom[.] I went to get a restraining order a few weeks later[.] I

- 4 -

> went back to my apartment and found the window busted and
> my apartment trashed[.]

Mother indicated that this was only the most recent incident of domestic violence. Mother also filed petitions for orders of protection on behalf of Savannah and Josiah. Therein she indicated that Father "smacked" the children and constantly threatened and belittled them. Mother also indicated that Father would "constantly throw [Josiah] around." The Knox County Circuit Court entered an order on January 30, 2013, indicating that the allegations in the order of protection petition "rise to dependency and neglect." The Circuit Court therefore directed Mother to file a petition regarding the children in juvenile court.

In February 2013, Mother had contact with DCS in Knox County. At that time, Mother reported to DCS that she left Father because of domestic violence, violence against the children, and Father's illegal drug use. Mother stated that Father kicked Savannah and "busted in the bathroom" to throw Mother's phone in the bathtub when the family resided together in Oregon. Mother also reported that Father was very mean to Josiah, apparently because he did not like Josiah's name and did not believe that Josiah was his biological child. No services were recommended by DCS at that time.

In late March 2013, DCS again became involved with the family when Savannah was admitted to the hospital and diagnosed with pneumonia and bronchitis. This time, Mother reported to DCS that she had fled Father because he "slammed her head into the side of [a] tub causing hearing loss," and "kicked Savannah across the room when they lived in Oregon." One day after Mother made these statements to DCS, however, Mother indicated to DCS that she wanted to reconcile with Father and wanted him to move to Tennessee. Mother at that time claimed that her abuse allegations were fabricated. Father moved to Tennessee in early April 2013 and he and Mother reconciled. In May 2013, Knox County DCS inexplicably noted that the case was to be closed due to non-compliance. On September 30, 2013, however, DCS received another referral against both Mother and Father for environmental neglect. DCS determined that no services were needed at that time.

DCS for the Eastern Tennessee Region, however, again had contact with Mother and Father on April 24, 2014, when DCS received a referral regarding physical and psychological abuse of Josiah by Father. According to DCS internal documents, DCS was informed that Father "aggressively" pulled Josiah by his hair from the lobby of a building. Although law enforcement was called, Father was not arrested "due to the child not having any marks." DCS's records indicate that services were recommended but refused.

On or around June 9, 2014, DCS received another referral against Father regarding lack of supervision. According to DCS records, Josiah was found wandering in the middle of the street with no supervision. Father indicated that the child slipped out while he was in the

bathroom. When he returned and noticed that Josiah was missing, Father called Mother and the police, who eventually returned the child to Father.

Shortly thereafter, on June 13, 2014, DCS received another report of harm, this time indicating that Father was pulling Josiah around in public by his hair. The person who made the report to DCS stated that Father is aggressive with Josiah and Josiah appears to be afraid of Father. The referent also indicated his or her fear that Mother was not intervening on behalf of the children.

At this time, DCS recommended that Mother and Father participate in services with DCS, including home visits and mental health assessments. Father, however, was initially unwilling to participate in services outside the home. In-home services were not available, however, as DCS's in-home provider refused to work with Father because they were fearful of him based upon their prior interactions with him. DCS records showed that the services were refused due to "anger, outbursts, and inappropriate discipline" by Father. When Mother informed DCS that Father was unwilling to participate in services outside the home, DCS filed a petition in Campbell County Juvenile Court asking that Mother and Father be required to participate in services. On July 1, 2014, DCS again made contact with Mother, who indicated her desire to leave Father due to domestic violence fears. DCS offered to help Mother and the children move into a shelter. Mother did not leave the home with the children. It does appear from the record, however, that parents did participate in some services, including allowing home visits during the summer of 2014. Mother eventually gave birth to Trinity in August 2014.

According to DCS, the Campbell County Juvenile Court proceeding was eventually non-suited on October 1, 2014, when DCS informed that court that Mother and Father had moved to Knox County. Less than five days later, however, the child would suffer severe injuries in Knox County. At that point, DCS again became involved with the family, filing a petition in the trial court to have the children declared dependent and neglected and the victims of severe abuse. Although the trial court entered an order finding probable cause to remove all of the children and place them in DCS custody, no adjudicatory hearing ever took place on DCS's petition.

Angela Fuss, the children's mental health counselor, testified regarding her treatment of the children after they were removed from Mother's and Father's custody. Dr. Fuss holds a Ph.D. in Counselor Education and is a Licensed Professional Counselor-Mental Health Service Provider. Dr. Fuss began treating the children in March of 2015. The children began receiving therapy shortly after an incident in their foster home where Josiah fell and bloodied his nose and Savannah became hysterical at the sight of the blood. Dr. Fuss diagnosed Savannah with anxiety, post-traumatic stress disorder ("PTSD"), and neglect. Josiah was also diagnosed with PTSD, as well as physical abuse and neglect. Dr. Fuss indicated that Josiah's PTSD stems from his severe abuse, while Savannah's PTSD stems from witnessing the abuse

in the home. According to Dr. Fuss, in her first visit with Savannah, the child, without prompting, stated that "Daddy hurt [Josiah's] face." When asked to clarify, Savannah indicated that Father hit Josiah's "face on the wall." Dr. Fuss testified that Savannah would often repeat that Father "hurt [Josiah's] face on the wall" and disclosed that Father called her names. Josiah was not present during Savannah's initial disclosure. According to Dr. Fuss, Josiah never explicitly stated that Father caused his injuries. Dr. Fuss testified, however, that both Savannah and Josiah would state that Father was "mean" during their counseling sessions and that Josiah would often agree with Savannah when she spoke about Father hurting Josiah.

At first, both Savannah and Josiah exhibited aggressive and defiant behavior during therapy. Josiah also experienced nightmares and separation anxiety. According to Dr. Fuss, Savannah has made significant improvements with her speech delay and interpersonal skills, but Josiah has not. Dr. Fuss indicated that Josiah's lack of improvement could be due to his skull injuries or pediatric bi-polar disorder but that she had not fully investigated those possibilities. Initially, both Mother and Father were permitted supervised visitation with Savannah, while only Mother was allowed to visit with Josiah. In March 2015, however, Dr. Fuss testified that she recommended that all visitation with Father be terminated because the visits led to jealousy on the part of Josiah. At trial, counsel for DCS indicated that an order temporarily suspending Father's visitation had previously been entered.

The children's current foster mother ("Foster Mother") also testified. Foster Mother obtained possession of Savannah and Trinity immediately following their removal. Josiah joined his sisters in the home approximately one month later. According to Foster Mother, she initiated counseling for the children after Savannah became hysterical after seeing Josiah bleeding due to an accidental fall. Foster Mother testified that after seeing the blood, Savannah believed that Josiah was dead. Once Josiah received medical attention to stop the bleeding, Savannah informed Foster Mother that "Daddy hit [Josiah's] head on the wall . . . and floor." In making this disclosure, Savannah "hit the wall" and "touched the floor." Foster Mother had to convince Savannah that Father was not present and that Josiah was not severely injured. Foster Mother testified that Savannah sometimes repeats her statement that Josiah was injured by Father, especially when she sees blood. At the time of the first incident, Foster Mother was not aware of the abuse allegations against Mother and Father; accordingly, she requested that DCS allow the children to attend counseling.

Foster Mother mirrored Dr. Fuss's testimony that while Savannah had made significant improvements since entering therapy, Josiah has not. Foster Mother testified that Josiah initially had nightmares where he would wake up screaming and would have recurring nosebleeds. Foster Mother explained that Josiah needs considerable attention and that he still has significant anger issues. Foster Mother testified that, on the whole, all three children are doing well in foster care, though the youngest child suffers from asthma. Foster Mother

admitted, however, that hers is not a pre-adoptive home and that the children would soon be moving to a home that had been approved for adoption.

Josiah's former foster mother ("Former Foster Mother") also testified. Former Foster Mother stated that she had possession of Josiah for approximately the first month after he was released from the hospital following his injuries. Former Foster Mother echoed Foster Mother's testimony regarding Josiah's recurring nightmares and issues with anger and aggression. Likewise, Former Foster Mother testified that after seeing pictures of his injuries, Josiah informed her that "Mommy hit my eye and head. Daddy hit my head."

Mother testified on her own behalf. Mother admitted that Father had physically abused her in the past, mirroring the allegations she made throughout her history with DCS. Mother also admitted that Father had been physically abusive to Savannah in the past. According to Mother, Father was "heavy into drugs" at that time. Mother admitted that she left Father, moved to Tennessee, and sought a restraining order against Father. The order was "dropped," however, because Mother reconciled with Father. According to Mother, she only sought the order to prevent Father from removing the children from daycare; the children, however, were never placed in daycare. Mother admitted at trial that she had previously left Father while pregnant with Savannah but reconciled with him after Father promised he would change. Mother testified that in April 2014, she asked DCS to come to the hospital where Savannah was being treated in an effort to remove the order of protection because she wanted Father to come to Tennessee. At that time, Father's counselor assured Mother that Father had made significant progress in his drug use and anger issues.

Mother denied that Father was abusive toward the children after moving to Tennessee. For example, she stated that the incident wherein an individual witnessed Father pulling Josiah's hair or arm mischaracterized the situation; instead, Father was simply attempting to pull Josiah out of the street. Mother testified that many of the allegations of abuse in the DCS record had simply been made up by DCS, including her desire to leave Father in July 2014.

Mother admitted that Father immediately did not stop abusing alcohol after their reconciliation or even after the children were removed. In fact, Mother admitted that in January 2015, a neighbor made a noise complaint because Father was "extremely drunk . . . [a]nd falling all over the place." Mother stated, however, that Father only drank alcohol "that one time." Mother admitted that she had asked Father to leave her home again in January 2015 but that they had again reconciled.

Mother did not specifically discuss the October 5, 2014 incident during her trial testimony. Father, however, did provide his own explanation for Josiah's injuries. Father denied that Josiah's injuries were in any way the result of non-accidental trauma perpetrated by Father. According to Father, he was in the living room with Mother and other family members when Mother put Josiah and Savannah down for a nap. Approximately thirty

minutes to an hour later, they heard a loud crash. Mother initially went to check on the children where they were napping. According to Father, a few minutes later, Mother asked Father to join her in the bedroom. At the hearing, Father claimed that Mother had already picked the chest of drawers off Josiah by the time he came into the room. While Mother asked another individual to call an ambulance, Father testified that he took care of Josiah and, after obtaining some toilet paper, cleaned much of the blood off of him. Father later testified, however, that he never held Josiah. According to Father, Josiah then began to vomit, so Mother carried him outside to wait for the ambulance. Father testified that the blood that was found under the child's mattress came from the child's vomit that "went under the mattress."

Father also explained that his refusal to speak with investigators at the hospital following Josiah's injuries was due to his lack of trust in others based upon his inability to understand. Father testified that he suffers from seizures and attention deficit hyperactivity disorder that prevent him from reading well or understanding others. Father testified that his issues also negatively affect his memory.

Father testified that Mother fabricated most of her claims of the domestic violence that allegedly occurred in Oregon. Father later admitted, however, that he did hit Mother's head on the side of the bathtub in Oregon. Father generally denied that he had ever abused the children, in either Oregon or Tennessee. Father admitted that he had previously been cited for marijuana possession, methamphetamine possession, and shoplifting in Oregon. More recently, Father admitted that he had been arrested in January 2015 relative to the noise complaint and his consumption of alcohol but testified that he had no recollection as to why he was arrested. Father admitted that he had previously abused alcohol and drugs and that he promised Mother he would refrain from that behavior when he moved to Tennessee.

Father testified that since the children were removed, he has followed DCS's recommendations to obtain an alcohol and drug assessment, attend alcohol and narcotics anonymous classes, attend anger management treatment, and pass drug screens. Father testified that he has completed or is in the process of completing all of these requirements. Father submitted a letter from his current mental health counselor, which indicated that Father had been regularly attending therapy since May 2015 and had been making progress on the management of his emotions. Father's therapist stated in the letter, however, that Father maintained that he had not caused Josiah's injuries. Father admitted, however, that he only recently began attending the anger management courses and must complete approximately a year more of treatment.

Lori Young with DCS, testified about Mother's and Father's efforts to comply with the permanency plan put in place for the children. Generally, Mother and Father had made an effort to comply, but many of their efforts had begun after the termination petition was filed. Indeed, according to Ms. Young, the only anger management class that Father had attended

had occurred the week prior to the termination trial. Mother had yet to attend any anger management classes, though she did attempt to do so in November 2015, but was unable to do so because of a financial oversight by the provider. Ms. Young admitted, however, that Father had participated in therapy sessions that would also address his anger management issues. Ms. Young testified that Mother also participated in individual mental health counseling. Ms. Young further testified that Father did not provide documentation of his attendance at alcoholics or narcotics anonymous meetings until July 2015. A purported sign-in sheet from Father's alcoholics or narcotics anonymous meetings showed one meeting in 2013 and then increased participation from November 13, 2015, until the December 8, 2015 trial date. Generally, Ms. Young testified that parents were often unwilling to work with certain service providers or switched providers after a few sessions for various issues. Ms. Young also testified that Father completed all required alcohol and drug assessments. Despite all of these efforts, Ms. Young testified that the greatest issue with Mother's and Father's efforts has been their unwillingness to admit that their home has been a den of domestic violence, physical aggression, and abuse of the children. According to Ms. Young, this issue cannot be addressed until Mother and Father acknowledge its existence.

Mother's younger brother ("Younger Brother"), who was present in the home on October 5, 2014, testified last. Younger Brother's testimony generally echoed Father's testimony as to how Josiah was injured, with some inconsistencies. First, Younger Brother testified that the children had only been napping for fifteen minutes when the family heard the crash. According to Younger Brother, he, rather than Mother, was the first to enter the room and see the chest of drawers on Josiah. Younger Brother also testified that he never witnessed Father leave the room to obtain toilet paper, that Father did not clean Josiah, and that Father indeed picked Josiah up at one point while the child was bleeding and carried him to the porch to await the ambulance.

The trial court issued an oral ruling on December 10, 2015. Eventually on January 24, 2016, the trial court entered a written order in both Mother's and Father's cases containing detailed and thorough findings of fact and conclusions of law. Therein, the trial court ruled that there was clear and convincing evidence that: (1) the children were dependent and neglected; (2) Josiah was the victim of severe abuse by both Mother and Father as defined in Tennessee Code Annotated Section 37-1-102(b)(21); (3) the ground of severe abuse had been proven by clear and convincing evidence as to all three children under Tennessee Code Annotated Section 36-1-113(g)(4); (4) the ground of persistent conditions had been proven as to both Mother and Father under Tennessee Code Annotated Section 36-1-113(g)(3); (5) clear and convincing evidence supported a finding that termination was in the children's best interests.

Mother and Father separately appealed the trial court's order. On February 5, 2016, this Court entered an order, *sua sponte*, consolidating Mother's and Father's appeals pursuant to Rule 16(b) of the Rules of Appellate Procedure for purposes of briefing and oral argument.

Although we consider each parent individually, because DCS filed only a single petition and the trial court issued only a single order in this case, we likewise consolidate Mother's and Father's appeals for purposes of our Opinion.

**Issues Presented**

As we perceive it, there are three issues in this appeal with regard to both parents:

1. Whether the trial court erred in finding clear and convincing evidence to support the persistent conditions ground for termination of parental rights.
2. Whether the trial court erred in finding clear and convincing evidence to support the severe abuse ground for termination of parental rights.[4]
3. Whether the trial court erred in finding clear and convincing evidence that termination of both parents' parental rights is in the children's best interests.

**Discussion**

As recently explained by the Tennessee Supreme Court:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see*

---

[4] Mother does not raise an issue on appeal that the trial court erred in finding severe abuse. The Tennessee Supreme Court, however, has directed this Court to consider every ground for termination found by the trial court, even if not specifically appealed by the parent. *See In re Carrington H.*, 483 S.W.3d 507, 525–26 (Tenn. 2016), *petition for writ of cert. docketed* (April 27, 2016) ("[W]e hold that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal."). Accordingly, we will consider the evidence with regard to severe abuse as to both parents.

- 11 -

> *also* ***Santosky v. Kramer***, 455 U.S. 745, 747 (1982); ***In re***
> ***Angela E.***, 303 S.W.3d at 250.

***In re Carrington H.***, 483 S.W.3d 507, 522–23 (Tenn. 2016) (footnote omitted).

Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." ***In re Jacobe M.J.***, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting ***In re W.B.***, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); ***In re D.L.B.***, 118 S.W.3d 360, 367 (Tenn. 2003); ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. ***Santosky***, 455 U.S. at 769. Consequently, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); ***In re Valentine***, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." ***In re M.J.B.***, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." ***Id***. at 653.

In light of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d). As to the trial court's findings of fact, our review is de novo with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. ***Jones v. Garrett***, 92 S.W.3d 835, 838 (Tenn. 2002).

When the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *See* ***McCaleb v. Saturn Corp.***, 910 S.W.2d 412, 415 (Tenn. 1995); ***Whitaker v. Whitaker***, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded

will be given great weight by the appellate court. ***Walton v. Young***, 950 S.W.2d 956, 959 (Tenn. 1997).

## I.

We begin with the ground of persistent conditions. Pursuant to Tennessee Code Annotated Section 36-1-11(g)(3), a ground for termination exists when:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;
> . . . .

In this appeal, both Mother and Father argue that the trial court erred in applying the persistence of conditions ground for termination where no court entered an order following an adjudicatory hearing finding the children dependent, neglected, or abused more than six months prior to the termination hearing. Mother and Father contend that such an order is required by this Court's holding in ***In re Audrey***, 182 S.W.3d 838 (Tenn. Ct. App. 2005). We agree.

In ***Audrey***, we held that the ground of persistent conditions, Tennessee Code Annotated Section 36-1-113(g)(3), can only apply where the record contains a "prior court order removing the child from the parent's home that was based on a judicial finding of dependency, neglect, or abuse[.]"***Audrey***, 182 S.W.3d at 874. The ***Audrey*** Court explained that an order from a preliminary hearing removing the children from the home was insufficient to qualify under the statute because it did not contain a finding, based on clear and convincing evidence, that the child was dependent, neglected, or abused. As such, the persistence of conditions ground for termination contained in Tennessee Code Annotated Section 36-1-113(g)(3) was inapplicable.

- 13 -

The same is true in this case. Here, DCS concedes in its appellate brief that at the time of the termination hearing, the juvenile court had not yet entered an order containing a judicial finding of dependency, neglect, or abuse based upon clear and convincing evidence. Indeed, a November 18, 2014 judicial review order is contained in the record indicating that a final hearing would take place in March 2015. The record on appeal, however, does not indicate that the hearing took place and no order resulting from such a hearing is included in the record.[5] In its final order, the trial court found that the children had been removed from the home for a period of more than six months but did not cite any order containing a finding of dependency, neglect, or abuse as the basis for its application of the persistent conditions ground for termination. Because the record on appeal does not contain any order containing a judicial finding of dependency, neglect, or abuse entered more than six months prior to the termination of parental rights hearing, the trial court erred in applying the persistence of conditions ground for termination to this case.[6] The trial court's finding that clear and convincing evidence supports the ground of persistent conditions is, therefore, reversed as to both Mother and Father.

## II.

We next consider whether the trial court erred in finding clear and convincing evidence of severe abuse. Pursuant to Tennessee Code Annotated Section 36-1-113(g)(4), a ground for termination exists when:

> The parent or guardian has been found to have committed severe
> child abuse as defined in § 37-1-102, under any prior order of a
> court or is found by the court hearing the petition to terminate

---

[5] Father asserts in his brief that the hearing did not take place because of discovery delays.

[6] Although it is somewhat unclear from its brief, it appears that DCS argues that the order terminating Mother's and Father's parental rights, which was entered on January 22, 2016, was a sufficient order under *Audrey* because it contained a judicial finding, based upon clear and convincing evidence, that the children were dependent, neglected, and abused. This argument ignores the plain language of Tennessee Code Annotated Section 36-1-113(g)(3), which requires that such an order removing the children be entered for at least six months before the trial court may rely upon the persistent conditions ground for termination. Because the dependency and neglect finding and the finding regarding persistent conditions were made in the same order, the children had clearly not been removed from the home for a period of more than six months by an order containing a judicial finding of dependency, neglect, or abuse at the time the trial court utilized the persistent conditions ground for termination. DCS also argues we should revisit this Court's holding in *In re S.S.-G.*, No. M2015-00055-COA-R3-PT, 2015 WL 7259499 (Tenn. Ct. App. Nov. 16, 2015), that the order containing the judicial finding of dependency, neglect, or abuse be final at the time it serves as the underlying basis for the application of Tennessee Code Annotated Section 36-1-113(g)(3), as DCS argues such a result is not contemplated by the termination statutes. Because there is no order, final or otherwise, in this case in which a judicial finding of dependency, neglect, or abuse was made more than six months prior to the termination hearing, we need not consider this issue.

- 14 -

parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian; . . . .

In turn, severe child abuse is defined as, *inter alia*:

(A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;

(ii) "Serious bodily injury" shall have the same meaning given in § 39-15-402(d).

(B) Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct; . . . .

Tenn. Code Ann. § 37-1-102(b)(21). Serious bodily injury, as defined by Tennessee Code Annotated Section 39-15-402(d),

includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects.

Tennessee Code Annotated Section 37-1-102(b)(21)(A)(i) specifically requires that the exposure or failure to protect a child from severe abuse be "knowing." As we explained:

In child abuse cases, the parent or caregiver may deny that the injury was purposefully inflicted, and where the injuries are inflicted on pre-verbal infants and children, there is often no witness to the injury other than the parent or caregiver. The "knowing" element can and often must be gleaned from circumstantial evidence, including but not limited to, medical

- 15 -

> expert testimony on the likelihood that the injury occurred in the manner described by the parent or caregiver. Moreover, "knowing" conduct by a parent or caregiver is not limited to conduct intended to cause injury[.]

*In re Kason K.C.*, No. M2013-01607-COA-R3-JV, 2014 WL 1878767, at *5 (Tenn. Ct. App. May 7, 2014). While the term "knowing" as used in Section 37-1-102(b)(23) is not defined by statute, our courts have previously considered its definition in the context of a dependency and neglect proceeding. *See id.* at *5; *In re Caleb J.B.W.*, No. E2009-01996-COA-R3-PT, 2010 WL 2787848, at *5 (Tenn. Ct. App. July 14, 2010); *In re H.L.F.,* 297 S.W.3d 223, 236 (Tenn. Ct. App. 2009); *In re R.C.P.*, No. M2003-01143-COA-R3-PT, 2004 WL 1567122, at *7 (Tenn. Ct. App. 2004). We will therefore consider a person's conduct to be "knowing," and a person to act or fail to act "knowingly," when a parent "has actual knowledge of the relevant facts and circumstances or when he or she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to him or her." *Caleb*, 2010 WL 2787848, at *5 (citing *R.C.P.*, 2004WL 1567122, at *7).

Here, there can be no dispute that the child's multiple skull fractures constituted a serious bodily injury pursuant to Tennessee Code Annotated Sections 37-1-102(A)(i) and 39-15-402(d). Furthermore, the children's counselor testified that Josiah suffered from PTSD as a result of the physical abuse he suffered in the home. The evidence shows that Josiah continues to suffer from nightmares, defiance, and aggression as a result of his trauma. This Court has previously held that testimony that the children suffered from "an adjustment disorder, mixed with anxiety and depression, and post-traumatic stress disorder" as a result of their abuse and neglect was sufficient to meet the statutory definition of severe abuse contained in Tennessee Code Annotated Section 37-1-102(b)(21)(B). *In re Caleb F.N.P.*, No. M2013-00209-COA-R3-PT, 2013 WL 5783141, at *14 (Tenn. Ct. App. Oct. 25, 2013).

Father argues, however, that the evidence in the record regarding the cause of the child's injuries is insufficient to meet the clear and convincing standard. Specifically, Father asserts that Dr. Perales's testimony was insufficient because she never interviewed Father or any other individuals at the home and the trial court even mentioned that Dr. Perales's testimony was "a little inconclusive" in its oral ruling. Respectfully, we disagree. First, we note that the trial court's written order terminating Mother's and Father's parental rights does not contain an indication that Dr. Perales's testimony was inconclusive. While the trial court did make this statement in its oral ruling, trial courts speak through their written orders, rather than the trial transcript. *Alexander v. JB Partners*, 380 S.W.3d 772, 777 (Tenn. Ct. App. 2011) (citing *Steppach v. Thomas*, 346 S.W.3d 488, 522 (Tenn. Ct. App. 2011)). This is especially true in termination of parental rights cases, where trial courts are directed by statute to make written findings to support their decisions. *See* Tenn. Code Ann. § 36-1-113(k) ("The court shall enter an order that makes specific findings of fact and conclusions

of law within thirty (30) days of the conclusion of the hearing."). As such, we will only consider the trial court's written ruling in this case.

Moreover, despite Father's focus on Dr. Perales's testimony in his appellate brief, it is clear from the trial court's order that it did not consider Dr. Perales's testimony in isolation. Instead, the trial court specifically relied upon the statements made by Josiah and Savannah to their counselor and Foster Mother regarding the cause of Josiah's injuries in finding that Mother and Father exposed Josiah to severe abuse or failed to protect him from severe abuse. To recap, Dr. Perales testified that the child's injuries would not have resulted from the scenario set forth by Mother and Father. Instead, Dr. Perales testified that the child's injuries likely resulted from non-accidental trauma. According to Dr. Fuss and Foster Mother, both children expressly blamed Father for the trauma, and sometimes implicated Mother in the injuries as well. Neither Mother nor Father objected to the admission of the children's statements at trial. Furthermore, the trial court specifically found the children's statements and their recitation by Foster Mother credible compared to the explanation offered by Mother and Father for the child's injuries. As previously discussed, this Court gives great weight to the credibility determinations made by the trial court and will not overturn those determinations absent clear and convincing evidence to the contrary. *See* ***Wells v. Tennessee Bd. of Regents***, 9 S.W.3d 779, 783 (Tenn. 1999).

Neither parent points to any evidence that would call into question the children's own statements that Josiah's injuries were caused by Father and, perhaps, Mother. Indeed, as the trial court pointed out in its order, the children's statements were corroborated by the history of abuse Mother suffered at Father's hands and the multiple reports of abuse of the children made to DCS after their move to Tennessee. Furthermore, the trial court specifically found that Savannah's explanation for Josiah's injuries, that Father slammed the child's head against a wall or the floor, was a better explanation for the child's injuries than the explanation offered by Mother and Father.

In other cases where severe injury has occurred to children unwilling or unable to pinpoint a perpetrator, we have concluded that the severe abuse was shown by clear and convincing evidence where an expert testified that the child's injuries "could not have occurred in the manner explained by [the parents]." ***In re Dakota C.R.***, No. W2010-01946-COA-R3-JV, 2012 WL 1418048, at *10 (Tenn. Ct. App. Apr. 24, 2012). The same is true in this case. Here, Mother's and Father's explanation for the abuse was not consistent throughout the proceedings, nor is it plausible. For example, we note that Mother initially told DCS investigators that she alone removed the chest of drawers from the child's chest and carried the child outside while awaiting an ambulance. During the video recording, however, Father was required to assist Mother in moving the chest of drawers and both indicated that Father helped Mother with the child after his injuries were discovered. Dr. Perales testified that this scenario was unlikely, as Father would have had significantly more blood on his clothing had he held the child following injuries. Later, Father testified that he

did not assist Mother in removing the chest of drawers from Josiah. In addition, the explanations provided by Father and Younger Brother at trial contained numerous inconsistencies, including whether Father held Josiah, who went into the room first, and how long the children had been alone before allegedly the family heard the crash that alerted them to Josiah's injuries. Furthermore, the parents' claim that the chest of drawers was only covering the child's chest does not adequately explain why the child suffered only minor injuries to his chest but severe injuries to his head. Given Dr. Perales's testimony, the history of abuse in this family, and the children's unsolicited statements, the evidence does not preponderate against the trial court's finding that non-accidental trauma at the hands of Father caused the child's injuries.

Finally, we note that Father is correct that Dr. Perales did not interview him or any of the other individuals present when the child was injured prior to coming to her conclusion that the injuries resulted from non-accidental trauma. Dr. Perales's failure to interview Father, however, was not fatal to her conclusions. First, Dr. Perales testified without dispute that she reviewed the video recording wherein both Mother and Father offered their explanation for the child's injuries. Furthermore, the record shows that Father was initially unwilling to speak with investigators. Under the totality of the circumstances, we conclude that the trial court did not err in finding clear and convincing evidence that Father committed or knowingly exposed Josiah to abuse, which has caused both severe bodily injury and "severe impairment of the child's ability to function adequately in the child's environment." *See* Tenn. Code Ann. § 37-1-102(b)(21)(A)(i), (B). The trial court therefore did not err in finding the ground of severe abuse against Father with regard to all of the children. *See* Tenn. Code Ann. § 36-1-113(g)(4) (stating that a ground for termination exists when the parent has committed severe abuse against a child "or against any sibling or half-sibling of such child"); *see also* ***In re Keara J.***, 376 S.W.3d 86, 107 (Tenn. Ct. App. 2012) (holding that a finding that a parent committed severe abuse against one child also served as a ground for termination for the victimized child's siblings, even those that did not suffer from the abuse); ***State, Dep't of Human Servs. v. Hauck***, 872 S.W.2d 916, 921 (Tenn. Ct. App. 1993) (holding that trial court's conclusion that parent committed severe abuse against the child's sibling was sufficient to support ground of severe abuse against uninjured child).

We concede that evidence that Mother actually caused Josiah's injuries is less convincing than the evidence tending to show that Father committed severe abuse against Josiah. At times, Josiah implicated Mother in his statements regarding his injuries; at other times, however, the children only blamed Father for the abuse. Regardless, this Court has repeatedly held that "direct evidence that [a parent] actively engaged in or witnessed abuse of his children is not necessary to find that he [or she] is guilty of severe child abuse and that the children are dependent and neglected." ***Dakota***, 2012 WL 1418048, at *10 (citing ***In re H.L.F.***, 297 S.W.3d 223, 236 (Tenn. Ct. App. 2009)). Instead, "a parent who has not directly abused her own child may still be found to have committed severe child abuse if she 'knowingly exposed the child to, or knowingly failed to protect the child from, conduct

constituting severe child abuse.'" ***H.L.F.***, 297 S.W.3d at 235–36 (quoting ***R.C.P.***, 2004 WL 1567122, at \*6). Thus, "[a] parent who is present when a child is abused but who fails to intervene to protect the child has knowingly exposed the child to, or has failed to protect the child from, abuse." ***H.L.F.***, 297 S.W.3d at 236. "A parent's failure to protect a child will also be considered 'knowing' if the parent had been presented with sufficient facts from which he or she could have and should have recognized that severe child abuse had occurred or that it was highly probable that severe child abuse would occur." ***R.C.P.***, 2004 WL 1567122, at \*7 (citing ***West Va. Dep't of Health & Human Res. ex rel. Wright v. Doris S.***, 475 S.E.2d 865, 878–79 (W.Va. 1996)).

Here, the trial court specifically found that:

> [Mother] was perfectly aware of the danger [Father] presented to the health and well-being of her children. She had personally witnessed [Father] verbally and physically abuse Savannah and Josiah on several occasions before October 5, 2014. In fact, [Mother] had kicked [Father] out of the home on at least two occasions . . . . On each such occasion she had done so for her safety and the safety of the children. However, she allowed [Father] to return to the family home each time. The physical attack of [Father] upon Josiah . . . most certainly did not come as surprise to [Mother]. [Mother] had placed her interests above the safety and well-being of her children. [Mother] was present in the family home on the afternoon of October 5, 2014, possessing personal knowledge of her husband's history of violent acts toward the children, and in particular, Josiah, and she failed to protect Josiah from her husband on that fateful afternoon of October 5, 2014.

The evidence in the record does not preponderate against the trial court's finding that Mother was aware of Father's violent tendencies and failed to protect Josiah from his abuse. Indeed, as the trial court mentioned, the evidence in the record shows that Mother fled Father due to his physical violence, moving across the country to escape him. Eventually, however, Mother allowed Father to move back into the home. What followed were multiple allegations of abuse that culminated in Josiah's nearly life-threatening skull fractures. Under these circumstances, the trial court did not err in finding that Mother committed severe child abuse under Tennessee Code Annotated Section 36-1-113(g)(4) by knowingly failing to protect Josiah from serious bodily harm. The trial court therefore did not err in terminating Mother's parental rights to all of the children. *See* Tenn. Code Ann. § 36-1-113(g)(4)); ***Keara***, 376 S.W.3d at 107; ***Hauck***, 872 S.W.2d at 921.

**III.**

Finally, we consider whether the trial court erred in finding clear and convincing evidence that termination of Mother's and Father's parental rights was in the children's best interests. When at least one ground for termination of parental rights has been established, the petitioner must then prove by clear and convincing evidence that termination of the parent's rights is in the child's best interest. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found to be unfit (upon establishment of ground(s) for termination of parental rights), the interests of parent and child diverge. *In re Audrey S.*, 182 S.W.3d at 877. The focus shifts to the child's best interest. *Id*. Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest. *Id*. However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36-1-101(d). Further, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." *Moody*, 171 S.W.3d at 194.

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. These factors include, but are not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to affect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal

- 20 -

activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). This Court has noted that, "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S.*, 182 S.W.3d at 877. As explained by this Court:

Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*Id.* at 878 (citing *Moody*, 171 S.W.3d at 194).

The trial court made detailed and thorough findings with regard to its finding that it was in the best interests of the children for Mother's and Father's rights to be terminated. First, the trial court found little evidence that Mother or Father had made an adjustment in circumstances that would allow the children to safely return to the home. *See* Tenn. Code Ann. § 36-1-113(i)(1), (2). The trial court cited Father's substance abuse and arrest in January 2015 and Mother's resulting attempt to again remove Father from her life only for her to eventually allow him to return to her home. As the trial court noted regarding Mother's decision to remain with Father despite her own allegations of abuse against him and multiple reports by others regarding abuse of the children:

> [Mother's] actions and testimony tell this Court plainly that contrary to what she has seen and experienced at the hands of [Father] and all the evidence presented in this trial, she believes [Father] presents little or no risk of harm to the children. [Mother] could not be more wrong in her beliefs about [Father] and the danger he presents to the children.

The trial court concluded that based upon Father's history of violence and the family's repeated participation in DCS services over the years with little effect, "it does not appear that a lasting adjustment by the parents using social services is reasonably possible." The trial court therefore concluded that these factors favored termination.

The trial court also concluded that given the testimony regarding the effect of the abuse on the children by Dr. Fuss and the children's own statements regarding the abuse, returning the children to Mother's and Father's home would "place all three children at risk of further abuse and neglect and devastate the children from a psychological standpoint." *See* Tenn. Code Ann. § 36-1-113(i)(5). The trial court noted, however, that because Foster Mother was not approved to adopt the children, they were likely to have a change in caretakers regardless of the result of the termination proceeding. However, given the evidence regarding abuse, the trial court nevertheless concluded that this factor weighed in favor of termination.

The trial court next found that the physical abuse of Josiah heavily weighed in favor of termination of Mother's and Father's parental rights. *See* Tenn. Code Ann. § 36-1-113(i)(6). As the trial court explained: "Not only did Savannah and Josiah suffer abuse from their father, they suffered abuse from their father, in large part, because their mother repeatedly exposed them to further abuse knowing that the father was subject to violent outbursts." The trial court further concluded that Mother's and Father's home was not a healthy and safe environment for the children due to Mother's and Father's history of abuse. *See* Tenn. Code Ann. § 36-1-113(i)(7).

The trial court also found that Mother's mental and emotional state:

> shows that she is unable to make necessary choices to preserve or ensure the health and well-being of her children. [Mother] has demonstrated time after time that she considers her personal needs paramount. Each opportunity she has had to establish a safe home for her children free of her abusive husband, has been ultimately rejected. [Mother] has clearly shown that she is incapable of providing safe and stable care and supervision for the children.

*See* Tenn. Code Ann. § 36-1-113(i)(8). With regard to Father, the trial court found that:

> [Father] has had numerous opportunities or chances to seek professional help to address his issues with substance abuse and violent outbursts. According to [Mother], [Father] has made use of such professional services to address these issues in the past; however, the life threatening assault on Josiah on October 5, 2014, and the relapse of in January 2015, show that those services have had little impact towards changing [Father] for the better.

*See* ***id.***

Not all factors, however, weighed in favor of termination in the trial court's estimation. The trial court conceded that Mother and Father exercised all visitation that was allowed to Mother and Father during the pendency of the juvenile court proceedings. *See* Tenn. Code Ann. § 36-1-113(i)(3). The trial court also found that Mother and Father had a meaningful relationship with the children. *See* Tenn. Code Ann. § 36-1-113(i)(4). The trial court, however, declined to place great weight on this factor, based upon the fact that returning the children to the home would likely subject them to "a dangerous environment" that Mother and Father failed to make "meaningful and significant efforts to change." The trial court also concluded that there was no evidence that Mother and Father failed to pay child support for the children. *See* Tenn. Code Ann. § 36-1-113(i)(9). Despite these findings, the trial court ultimately concluded that termination was in the children's best interests.

The evidence in the record does not preponderate against the trial court's findings with regard to the best interest factors contained in Tennessee Code Annotated Section 36-1-113(i). Here, while Mother and Father have made some effort to change their circumstances in the months and weeks leading up to trial, their efforts are simply "too little, too late." *See* ***In re K.M.K.***, No. E2014-00471-COA-R3-PT, 2015 WL 866730, at *6 (Tenn. Ct. App. Feb. 27, 2015) (holding that father's efforts after the termination petition was filed were "too little, too late"); ***In re A.W.***, 114 S.W.3d 541, 546 (Tenn. Ct. App. 2003) (holding that mother's improvement only a few months prior to trial was "[t]oo little, too late"). Indeed, the record shows that Mother and Father only attended anger management classes in the weeks before the termination hearing. Even more importantly, neither Mother nor Father has ever taken any responsibility for the injuries that Josiah sustained on October 5, 2014, or for the issues that the children continue to experience as a result of being exposed to violence in the home. As the trial court found, throughout the years, Mother made continuous complaints about Father's violent nature, only to reconcile and return him to her home each and every time.

We recognize that not every factor in this case favors termination. To be sure, Mother and Father exercised all visitation that was permitted, an important action on their part in

endeavoring to maintain and repair the parent-child relationship. However, the record also shows that as a result of the abuse that the children suffered and observed in the home, Savannah and especially Josiah have significant mental and emotional wounds that are only now beginning to be healed. We note that there is no evidence in the record that Mother's and Father's youngest child was ever the victim of any abuse or abuse exposure. Still, given Mother's and Father's failure to take responsibility for the abuse to which Savannah and Josiah were exposed, the evidence does not preponderate against the trial court's finding that all of the children would be unsafe if returned to Mother's and Father's home. Further, even considering the fact that the children will be required to change caretakers despite terminating Mother's and Father's parental rights, we agree with the trial court that severing the parent-child relationship between Mother, Father, and the children is in the children's best interest. This action provides the children with the best hope of being placed in a permanent, stable, and safe environment without the risk of severe abuse in the future. Under these circumstances, we affirm the trial court's determination that termination of Mother's and Father's parental rights to the children is in their best interest.

## Conclusion

The judgment of the Knox County Juvenile Court is reversed in part and affirmed in part. The trial court's ruling terminating Mother's and Father's parental rights is affirmed. Costs of this appeal are taxed to Appellants, Julia F. and Cody F., for all of which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE